UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
UNITED STATES OF AMERICA )
 )
v. )
 )
JOHN FIDLER )  No. 15-10300-DPW
DANIEL REDMOND )  (Leave to file granted on 11/23/15)
ROBERT CAFARELLI )
MICHAEL ROSS, and )
MARK HARRINGTON )
      Defendants )
_____ )

**Defendants' Motion To Dismiss Indictment
and Incorporated Memorandum of Law**

Now come the Defendants, by and through undersigned counsel, pursuant to the Due

Process Clause of the Fifth Amendment and Fed.R.Crim.P. 12(b), and hereby move the Court for

an order dismissing the above-captioned indictment against them.  As grounds and reason

therefor, defendants state the following:

1.       Even taking as true all allegations in the indictment, *see Boyce Motor Lines, Inc.*

*v. United States*, 342 U.S. 337, 343 n.16 (1952), defendants' conduct, as charged, is not

encompassed within the Hobbs Act.  *See United States v. Enmons*, 410 U.S. 396 (1973)

(affirming district court dismissal of indictment).

2.       The indictment does not charge that the defendants knew their actions were not in

furtherance of legitimate union objectives, and it therefore fails to allege an essential *mens rea*

element of the offense.

3.       The Hobbs Act, as applied, is void for vagueness.

1

**Request for Hearing**

The Defendants respectfully request a hearing on the within motion.

**Local Rule 7.1(a)(2) Statement**

The government does not agree to the relief requested herein.

**MEMORANDUM OF LAW**

I.  <u>**Introduction.**</u>

On June 10, 2014, the television show "Top Chef" began filming an episode inside a

Milton, Massachusetts, restaurant, with the assistance of a California-based production company

that had hired non-union workers to assist with the production.  In the morning hours, for

approximately an hour or two, and entirely in the presence of uniformed Milton Police Officers,

five members of the Local 25 Teamsters union openly picketed the production.  The government,

alleging that the defendants engaged in name calling, "stomach-bumping," and "chest-bumping"

on the picket line, has taken the extraordinary step of charging a union officer and four union

members with a Hobbs Act extortion.  Because the Superseding Indictment is legally flawed in

two fatal respects, and the Hobbs Act as applied is unconstitutionally vague, the Superseding

Indictment should be dismissed outright.

First, the Superseding Indictment is premised upon a profound misconception regarding

application of the Hobbs Act to the labor context.  Employing a picket line to persuade an

employer to replace non-union workers with union workers, so the union workers can perform

necessary labor (that absent a collective bargaining agreement would otherwise be done by non-

union workers), is categorically beyond the reach of the Hobbs Act.  Here, critically, the

government does not charge the defendants with demanding personal payoffs or wages for

2

*fictitious* services.  Instead, the government alleges that the production company had already hired non-union workers to drive its trucks and therefore, the government argues, the defendants' picketing for jobs constitutes an attempt to extort wages for "imposed, unwanted, *unnecessary* and superfluous services."  In the seminal decision of *United States v. Enmons*, 410 U.S. 396 (1973), the Supreme Court held that the Hobbs Act does not apply to union members' conduct (even violence) designed to achieve legitimate labor ends or objectives.  When the Supreme Court, in *Enmons*, offered that one example of non-legitimate labor ends would be exacting wage payments from employers "in return for imposed, unwanted, superfluous and fictitious services of workers," *Enmons*, 410 U.S. at 400, it necessarily meant the particular "services" to be performed (*i.e.*, fictitious, unneeded or unwanted *services*), not the particular laborer/worker (*i.e.*, unwanted union vs. wanted non-union) to perform the necessary services.  Here, the production company actually needed real drivers for real trucks—*i.e.*, there was nothing "superfluous," "imposed," "unwanted," or "unnecessary" about the services to be performed.  Had the government alleged here that the defendants picketed with the purpose of forcing the production company to "hire" drivers for "phantom" trucks, that would be a cognizable Hobbs Act violation.  Union members are not subject to federal prosecution, however, simply because they picketed to persuade an employer to use union workers, rather than non-union workers, to perform needed services.  As such, because the government's theory of prosecution, and the charging language it employs in the Superseding Indictment, run afoul of the Supreme Court's decision in *Enmons*, the Superseding Indictment returned in this case must be dismissed.

Second, the government has failed to plead an essential *mens rea* element.  *Enmons*, read in conjunction with the First Circuit's decision in *United States v. Sturm*, 870 F.2d 769 (1st Cir.

1989), requires that, to convict defendants of a Hobbs Act conspiracy or substantive offense, the government must prove beyond a reasonable doubt that the defendants *knew* that their actions were in pursuit of non-legitimate labor ends.  Here, the indictment does not charge the essential "knowledge" element and, for this reason as well, the Superseding Indictment should be dismissed.

Lastly, in addition to these indictment flaws, in Section V *infra*, the defendants argue that the Hobbs Act, as construed in *Enmons* and applied to this case (including the government's wrongful manipulation of the *Enmons* standard), is void for vagueness.  The defendants respectfully submit that persons of ordinary intelligence do not have fair notice that the conduct charged here would be construed as a violation of the Hobbs Act.

## II.     Relevant Facts (as drawn from the Superseding Indictment).

The International Brotherhood of Teamsters, Teamsters Local 25 ("Local 25"), is a labor organization that represents employees "in, among other things, the transportation, movie, and moving and trade show industries throughout New England."  Superseding Indictment at ¶1. "Beginning in the spring of 2014, Company A, a non-union production company, began scouting locations to film a reality television show" in the Boston area.  Superseding Indictment at ¶2. "Company A was not a signatory to any collective bargaining agreement with Local 25," and it had hired its own employees, "including drivers, to produce and participate in the filming of the show . . . ."  Superseding Indictment at ¶5.

According to the Superseding Indictment, on June 5, 2014, Daniel Redmond, "a member of Local 25," approached production company employees while they filmed at a Boston hotel, "demand[ing] that members of Local 25 be hired as drivers," and "insist[ing] that one of the

4

producers on set speak with" Mark Harrington, the Secretary-Treasurer of Local 25. Superseding Indictment at ¶6. The Superseding Indictment further alleges that, on that same date (June 5, 2014), Mr. Harrington advised Company A's producer that "all he cared about was that some of his guys get hired on the show." *Id.* The producer told Mr. Harrington that "all of the drivers had been hired and there was no work for Local 25 to perform." *Id.* Mr. Redmond thereafter demanded to know where Company A would be filming "and threatened to shut the production down that night." *Id.* "During several subsequent telephone calls that same day, Harrington and another union official [unidentified by the Superseding Indictment] warned the producer that if Company A did not make a deal with Local 25, they would start to follow them and picket." *Id.*

Five days later, on June 10, 2014, in the early morning hours, an unidentified Local 25 official told a producer for "Company A" that Local 25 knew they would be filming at "Restaurant A" in Milton, Massachusetts, and they would be sending "fifty guys to picket" the production. Superseding Indictment at ¶9. According to the Superseding Indictment, at approximately 9:00 a.m., the defendants appeared at the Milton restaurant and began to picket the production. Superseding Indictment at ¶10. The picketing lasted no more than several hours. *See* Superseding Indictment at ¶11 (alleging that picketing occurred "throughout the morning"). The Superseding Indictment alleges the following conduct occurred during the picketing:

> Two or three of the defendants entered the production area and began walking in lockstep toward the doors of the restaurant where they chest-bumped and stomach-bumped Crew members in an attempt to forcibly enter the restaurant. Throughout the morning, the defendants continued to use and threaten to use physical violence against members of the Crew and others. The defendants yelled profanities and racial and homophobic slurs at the Crew and others. The defendants blocked vehicles from the entryway to the set and used actual physical violence and threats of physical violence to try and prevent people from entering

the set. On one occasion, the defendants prevented a food delivery truck from delivering food. The defendants were also observed by the Crew standing in close proximity to cars belonging to the Crew, nine of which were later found to have had their tires slashed.

Superseding Indictment at ¶10.  The Milton Police were present during the entirety of the picketing.  Superseding Indictment at ¶9.  There are no allegations that any defendant was admonished by the officers, much less arrested or physically restrained.[1]

On September 29, 2015, the government secured an indictment charging five defendants with conspiring to violate the Hobbs Act, codified at 18 U.S.C. §1951 (Count 1), and attempting to violate the Hobbs Act (Count 2).[2]  Because the charging language of the Superseding Indictment is relevant to resolution of the instant motion, they are set forth below verbatim:

Count 1 of the Superseding Indictment charges the following:

---

[1] While outside the four corners of the Superseding Indictment, it bears noting that there are no allegations of physical violence in the formal incident report filed by the Milton Police Department regarding the events of that day.  The officers, present during the entire event, did not arrest any union member or file any applications for criminal complaints in the local district court (and the production company did not file any unfair labor practice charges with the National Labor Relations Board).  According to the formal police report, the crew members (who significantly outnumbered the five union members) were equally responsible for any verbal jousting that occurred that day.  As one officer wrote, the "teamsters were vocal but so were some of the crew members," and "[a]t times, I had to speak with crew members not to engage the teamsters verbally because when they did the situation would escalate."  Short video recordings of the incident, produced by the government as automatic discovery, do not show any violence or threat of violence and largely show the defendants peaceably picketing.

[2] The original indictment wrongfully named Richard Jeffrey as one of the five persons present during the picketing.  *See* Dkt. Entry 1 (original indictment).  While the government arrested him in the early morning hours of September 30, 2015, they eventually moved to dismiss the charges against him on the same date, before his initial appearance was convened.  *See* Dkt. Entry 12; http://www.masslive.com/news/boston/index.ssf/2015/09/law_enforcement_officials_nabb.html (last viewed October 31, 2015) (noting government indicted wrong person).  On or about October 6, 2015, a Superseding Indictment was returned charging Michael Ross as the fifth defendant.  Dkt. Entry 34.

Between on or about May 1, 2014, through October 31, 2014, both dates being approximate and inclusive, in Boston and Milton, and elsewhere within the District of Massachusetts, defendants (1) John Fidler, (2) Daniel Redmond, (3) Robert Cafarelli, (4) Michael Ross, and (5) Mark Harrington, together with others, known and unknown to the Grand Jury, conspired to obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by extortion, in that the defendants and their co-conspirators agreed to obtain property of Company A, a reality television production company, to wit: money to be paid as wages for imposed, unwanted, and unnecessary and superfluous services; with the consent of such entity, their officers and agents, which consent was induced by the wrongful use of actual and threatened force, violence, and fear of economic an physical harm to Company A and others.

It was part of the conspiracy that the defendants and their co-conspirators agreed to exert influence through the wrongful use of actual and threatened force and fear of physical and economic harm to Company A and others, in order to obtain wages for such imposed, unwanted and unnecessary and superfluous services for themselves and other third parties.

In violation of Title 18, United States Code, Section 1951.

Superseding Indictment at ¶13.

Count 2 charges:

Between on or about May 1, 2014, and continuing through October 31, 2014, both dates being approximate and inclusive, in Boston and Milton, and elsewhere within the District of Massachusetts, defendants (1) John Fidler, (2) Daniel Redmond, (3) Robert Cafarelli, (4) Michael Ross, and (5) Mark Harrington, together with others, known and unknown to the Grand Jury, obstructed, delayed and affected interstate commerce, and the movement of articles and commodities in commerce, by extortion, and attempted to do the same, in that the defendants and others known and unknown to the Grand Jury attempted to obtain property of Company A, a reality television production company, to wit: Money to be paid as wages for imposed, unwanted, and unnecessary and superfluous services; with the consent of Company A, its officers and other agents, which consent was induced by the wrongful use of fear of physical and economic harm to Company A and others, in order to obtain wages for such imposed, unwanted, and unnecessary and superfluous services for themselves, their friends and other third parties.

In violation of Title 18, United States Code, Sections 1951 and 2.

Superseding Indictment at ¶15.

The indictment does not charge any defendant with demanding or receiving any personal payoffs.  There are no allegations that any defendant engaged in any violent conduct or unseemly behavior, or threatened any violence, outside the strict confines of the June 10 picketing event. In short, all of the alleged "violence" and "threats" occurred (1) within the context of union officials attempting to persuade an employer to hire union workers to replace non-union workers and/or (2) during a single, isolated picketing event that lasted no more than the "morning" of June 10, 2014.

III.   **The Superseding Indictment does not charge a federal offense:** Picketing a non-union employer (for less than 3 hours), with the goal of replacing non-union workers with union workers, to perform real labor that absent a collective bargaining agreement would otherwise be done by non-union workers, is categorically beyond the reach of the Hobbs Act.

   A.   *The Hobbs Act does not reach conduct designed to achieve legitimate labor objectives or ends, even if violence or threats of violence are encompassed within such conduct*.

Any assessment of the issues raised in this motion must begin with the Supreme Court's decision in *United States v. Enmons*, 410 U.S. 396 (1973), wherein the Court rejected a Hobbs Act prosecution against striking union members who, among other acts of violence that far outstrip any conduct alleged in this case, blew up a transformer substation owned by their employer.  Interpreting the Hobbs Act definition of "extortion,"[3] the Court concluded that the term "wrongful," which "modifies the use of each of the enumerated means of obtaining property," "has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist

---

[3]  "The obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear . . . ."  18 U.S.C. §1951(b)(2).

has no lawful claim to that property." *Id.* at 399, 400. Thus, while the Hobbs Act "has properly been held to reach instances where union officials threatened force or violence against an employer in order to obtain personal payoffs and where unions used the proscribed means to exact 'wage' payments from employers in return for 'imposed, unwanted, superfluous *and fictitious* services' of workers," *id.* at 400 (emphasis added), *quoting United States v. Green*, 350 U.S. 415, 417 (1956), "the literal language of the statute will not bear the government's semantic argument that the Hobbs Act reaches the use of violence to achieve *legitimate union objectives*, such as higher wages in return for *genuine services which the employer seeks*" because in such cases "there had been no 'wrongful' taking of the employer's property; he has paid for the services he bargained for, and the workers receive the wages to which they are entitled in compensation for their services." *Id.* (emphasis added).

Ultimately, after a thorough review of the legislative history of the Hobbs Act, the Court held that "the Act *does not apply to the use of force to achieve legitimate labor ends*." *Id.* at 401 (emphasis added). The Court further noted that it "was repeatedly emphasized in the debates that the bill did not interfere in any way with any legitimate labor objective or activity; there is not a thing in it to interfere in the slightest degree with any legitimate activity on the part of labor people or labor unions." *Id.* at 404. Notably, in rejecting the government's proposed expansive construction, the Court observed that otherwise "[t]he worker who threw a punch *on the picket line*, or the striker who deflated the tires on his employer's truck would be subject to a Hobbs

Act prosecution and the possibility of 20 years' imprisonment and a $10,000 [now $250,000] fine." *Id.* at 411 (emphasis added).[4]

The Court further found that the statute could not, in any event, be expanded as the government proposed for two fundamental reasons.  First, "[t]his being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity." *Id.*  Second, "it would require statutory language much more explicit than that before [the Court] to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes.  Neither the language of the Hobbs Act nor its legislative history can justify the conclusion that Congress intended to work such an extraordinary change in federal labor law or such an unprecedented incursion into the criminal jurisdiction of the states." *Id.* The Court emphasized that:

> unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States. . . . [W]e will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction.

*Id.* at 411–12, *quoting United States v. Bass*, 404 U.S. 336, 349 (1971).

---

[4] *Enmons* did, to be sure, arise in the context of a strike, but the Court's use of the more expansive terms "legitimate labor ends" and "legitimate union objectives," and its reference to a punch thrown during a picketing event, surely indicates that it did not view its decision as limited to the strike context, particularly when read in conjunction with its conclusion that, in enacting the Hobbs Act, Congress did not intend to work extraordinary changes in labor law.  In *United States v. Porcaro*, 648 F.2d 753 (1st Cir. 1981), the First Circuit observed that *Enmons'* reasoning "was obviously and explicitly tied to the labor context and more specifically to the strike context." *Id.* at 760, *quoting United States v. Cerilli*, 603 F.2d 415, 419 (3d Cir. 1979). The court did not limit *Enmons* to strikes; it was addressing "a contractual dispute among businessmen," *Porcaro*, 648 F.2d at 760, and the court simply was not called upon to actually decide whether *Enmons* extended beyond the strike context, nor has it had an opportunity since *Porcaro* to address the scope of "legitimate labor ends."

B.       *The conduct as charged—picketing an employer's use of non-union labor, with the objective of persuading the employer to sign a CBA and thereby replace some non-union workers with union labor to perform real work—lies squarely in the heartland of legitimate union objectives and labor ends.*

In the wake of *Enmons*, it is now well-established that the Hobbs Act does not reach conduct that constitutes "legitimate union objectives" or "legitimate labor ends," even when violence is used to achieve those objectives or ends.  While the outer boundaries of "legitimate labor ends" has not been fully defined by the Supreme Court, resolution of that larger issue is beyond this case because, no matter where the outer bounds lie, picketing an employer to protest a company's failure to maintain community or area standards ("area standards" picketing) or to persuade the company to sign a collective bargaining agreement ("recognitional" picketing) falls squarely within the heartland of "legitimate" labor objectives and/or ends.

As noted *supra*, *Enmons* offered two examples of what might constitute <u>non</u>-legitimate labor ends: the obtaining of personal payoffs and "exact[ing] 'wage' payments from employers in return for imposed, unwanted, superfluous and fictitious services of workers."[5] *Enmons*, 410 U.S. at 400.  In this case, the government has charged the defendants with a variant of the *Enmons* language: rather than allege "fictitious" services, the government charges that the defendants sought to obtain wages for "imposed, unwanted, unnecessary and superfluous services," Superseding Indictment at ¶¶13, 15, swapping "unnecessary" for "fictitious."

The distinction between the formulation referenced by the *Enmons* Court and that employed by the government here is one that matters.  From a factual perspective, the government has not charged the defendants with using violence or threats of violence to obtain

_____

[5] The Superseding Indictment does not allege personal payoffs so the balance of this pleading will address the latter language.

"fictitious" services.  Instead, the Superseding Indictment charges that, through its negotiations

with Company A, Local 25 sought _real_ jobs for _real_ workers for services actually wanted and

needed by Company A.  _See, e.g._, Superseding Indictment at ¶6 (averring that Redmond

"demanded that members of Local 25 be hired as drivers"); _id_. (Harrington wanted union

workers "hired on the show"); _id_. (noting that producer explained that all drivers had been hired).

In other words, the objective of the picketing charged in this case was to persuade Company A to

replace a few existing non-union workers with a commensurate number of union workers.[6]

From a legal perspective, it is inconsequential, as the Superseding Indictment alleges, that

Company A had already hired all of its drivers.  _See id_. at ¶5 ("Company A hired its own

employees ('the Crew'), including drivers, to produce and participate in the filming of the show

_and did not need any work performed by Local 25_.") (emphasis added).  Under _Enmons_, union

members cannot be prosecuted for Hobbs Act violations because they picketed a company to

replace non-union workers with union workers.  Stated another way, the modifiers "imposed,

unwanted, unnecessary and superfluous" must modify the particular labor or services to be

performed, not the particular laborer who will provide the needed labor/services.[7]

This is precisely what the court held in in _United States v. Kirsch_, 2015 WL 1472122

(W.D.N.Y. March 31, 2015), wherein the court rejected the government's theory that the use or

threatened use of violence to force employers to replace non-union workers with union workers

---

[6] While the government, in a press conference following the arrests, wrongfully proclaimed the defendants sought "no work" jobs, _see, e.g._, http://www.justice.gov/usao-ma/pr/teamsters-indicted-attempted-extortion-reality-television-production-company-0 (last viewed November 2, 2015), that is not the conduct charged in this case.

[7] Likewise, as addressed _infra_, _see_ Section V, this being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity.

constituted the extortion of wages and benefits to be paid by an employer for "unwanted,

unnecessary, and superfluous labor."  Noting that the terminology was drawn from the

indictment in *United States v. Green*, 350 U.S. 415, 417 (1956), the court held that the term

"labor" in the phrase "unwanted, unnecessary, and superfluous labor":

> must refer to the work to be performed (i.e., *services* of laborers) rather than to a
> particular laborer.  In other words, the wages and benefits at issue must have been
> paid for *work* that was "unwanted, unnecessary, and superfluous," rather than to a
> particular *individual* who may have been "unwanted, unnecessary, and
> superfluous."

*Id.* at *3 (emphasis in original).  The cases on which the government relied, the court continued,

involved the hiring of unneeded workers, not, as in that case (and this case), replacement of non-

union workers with union workers.  Where the latter was concerned, "even assuming that the

replacement workers were unwanted by the employer (perhaps because it had to pay higher

wages and benefits), and even assuming that the union workers were unnecessary (perhaps

because the employer already had a non-union employee performing the job), *under no

circumstances* were the so-called replacement union workers in this case superfluous, because it

is undisputed that the employers genuinely wanted and needed the work completed."  *Id.* at *5

(emphasis added).[8]  Based on its ruling, the court granted judgments of acquittal on all counts

and racketeering acts predicated upon the replacement of non-union workers by union workers to

perform needed work.

---

[8] The Second Circuit addressed the concept of "imposed, unwanted, superfluous and fictitious
labor services" in *United States v. Robilotto*, 828 F.2d 940 (2d Cir. 1987).  *Robilotto* involved a
labor union's requirement that a film production company employ "cover drivers."  The cover
drivers were not members of the union, performed no work, and were incapable of performing
the jobs that they purportedly were covering, yet had to be paid union wages.  The *Robilotto*
court found that cover drivers were "unwanted, superfluous and fictitious labor services."
*Robilotto*, 828 F.2d at 945.

Likewise, in *United States v. Perry*, No. 12-cr-10293-DJC, Judge Casper, in a labor case outside the strike context, instructed the jury it was a *legitimate* labor objective "for unions to identify work that is being performed by non-union workers or volunteers that could be performed by union members and to attempt to obtain that work." Dkt. 806 at 224. According to the instructions provided in *Perry*, the conduct as charged in this case fits squarely within "legitimate labor objectives."

Here, Company A "genuinely wanted and needed the work completed," *Kirsch*, 2015 WL 1472122 at *5; it hired non-union workers to perform the necessary services, and so, the government alleges, the defendants picketed Company A in an effort to persuade Company A to replace some non-union workers with union workers. That it was Company A's preference to continue to use the non-union employees it had hired, perhaps at rates and standards below those outlined in the collective bargaining agreement emailed to Company A on June 9, 2014, rather than hire members of Local 25, does not transform the *services* to be performed into "imposed, unwanted, unnecessary and superfluous" ones, as those terms can be properly construed under *Enmons*, and it does not transmogrify the defendants' picketing into a federal criminal offense.[9]

    C.    <u>*The government's charging formulation fails to state an offense and invites a Yates error*</u>.

By omitting "fictitious" from the charging instrument in this case, the government has fundamentally altered the construction of the Hobbs Act by the Court in *Enmons*, and, by doing so, has omitted an essential element of the offense and/or failed to plead a viable Hobbs Act

---

[9] The Collective Bargaining Agreement had been emailed to the Producer for Company A on June 9, 2014, at the request of the Producer, after a series of telephone conversations between the Producer and union officials.

prosecution.  It is well established that, to be sufficient, an indictment must "contain[] the elements of the offense charged."  *Hamling v. United States*, 418 U.S. 87, 117 (1974); *see, e.g.*, *Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998); *United States v. Berk*, 652 F.3d 132, 137 (1st Cir. 2011); *United States v. Morosco*, 67 F.Supp.3d 483, 487 (D.Mass. 2014).

The omission of "fictitious" distorts the language and meaning of *Enmons* and improperly permits the government to prosecute the defendants for lawful conduct—*i.e.*, attempting to persuade Company A to hire union workers to perform needed services (instead of non-union workers).  In *Enmons*, to support its assertion that the Hobbs Act reaches payments in return for "imposed, unwanted, superfluous and fictitious" services, the Court cited to *Green* and *United States v. Kemble*, 198 F.2d 889, 890–91 (3d Cir. 1952).  *Enmons*, 410 U.S. at 400 n.5. *Kimble*, unlike *Enmons* and this case, involved a demand for services that clearly were not needed or wanted by the employer—*i.e.*, they were fictitious.  In that case, a defendant insisted that a driver of a truck hire a union worker to unload the truck, despite the fact that the driver fully intended on unloading the truck himself, had already unloaded most of the truck when the defendant interposed, and he did not want or need a helper to unload the truck.  *Kimble*, 198 F.2d at 890–91.

The services in *Kimble* were "imposed" and "unwanted" and "superfluous" because they were "fictitious"—*i.e.*, they were entirely unnecessary because the driver hired by the company intended to unload the truck himself (and had already begun doing so).  In this case, by failing to charge that the services were "fictitious," the government has failed to plead a viable Hobbs Act prosecution and/or has omitted an essential element.  The government is not free to simply redefine the language of the Supreme Court.

Moreover, by doing so, the government invites an inevitable *Yates* issue.  A general verdict must be set aside where there are legal or constitutional defects in the indictment.  *See, e.g.*, *Yates v. United States*, 354 U.S. 298 (1957); *United States v. Capozzi*, 486 F.3d 711 (1st Cir. 2007) (discussing distinction between *Griffin v. United States* (evidentiary deficiency) and *Yates* (legal or constitutional defect)).  Here, the government's manipulation of the *Enmons* language, to seemingly create its own crime, not only fails to plead a crime, but if permitted to stand creates a potential *Yates* issue in this case when it comes to instructing the jury.  Any instruction to the jury that permits a finding of guilt based on the language employed by the government— "imposed, unwanted, and unnecessary and superfluous services"—will permit a conviction for conduct that is lawful, and will thereby infect the trial with reversible error.

IV.     **The indictment must be dismissed because both counts fail to allege an essential *mens rea* element of the offense.**

Here, the Superseding Indictment fails to charge an essential *mens rea* element in a labor-related Hobbs Act prosecution—*i.e.*, that the defendants *knew* that they were not acting in pursuit of a legitimate union objective—and both counts must therefore be dismissed.  As detailed below, *Enmons*, read in conjunction with the First Circuit's decision in *United States v. Sturm*, 870 F.2d 769 (1st Cir. 1989), requires that, to convict defendants of a Hobbs Act conspiracy or substantive offense, the government must prove beyond a reasonable doubt that the defendants *knew* that their actions were in pursuit of non-legitimate labor ends.  Here, the indictment does not charge the essential "knowledge" element and, for this reason as well, the Superseding Indictment should be dismissed.[10]

_____

[10] The rule of lenity (addressed *infra*, *see* Section V(B)) also requires that the Hobbs Act be read to include a knowledge element.

*Sturm* involved use of economic fear, which the court identified as <u>not</u> "inherently wrongful." *See id.* at 773. Because a defendant cannot be convicted of a Hobbs Act violation based on use of a legitimate economic threat if he has a claim of right to the property, the court held that "for purposes of the Hobbs Act, the use of legitimate economic threats to obtain property is wrongful only if the defendant has no claim of right to that property." *Id.* Accordingly, the court concluded, "wrongful," as used in the Hobbs Act, "requires the government to prove, in cases involving extortion based on economic fear, that the defendant knew that he was not legally entitled to the property that he received." *Id.* at 774. That conclusion, the court stated, is grounded in the notion, "universal and persistent in mature systems of law," that "an injury can amount to a crime only when inflicted with intention." *Id.*, *quoting Morissette v. United States*, 342 U.S. 246, 250–51 (1952). The Hobbs Act requires proof of intent, and the court defined the "critical issue" as "what level of intent is required for the 'wrongful use' element of the offense of extortion induced through wrongful use of fear." *Id.* The answer, the court explained, is:

> that this element requires the government to prove that the defendant did not have a claim of right to the property in question. As regards intent, we also believe that the statute requires the government to prove, at a minimum, that the defendant *knew* that he was not legally entitled to the property.

*Id.* (emphasis in original).

Just as there is nothing inherently "wrongful" in the use of economic fear, there is, under *Enmons*, nothing inherently "wrongful" under the Hobbs Act in the use or threat of violence in the labor context. Indeed, in *Enmons*, the Court specifically rejected the prospect that "[t]he worker who threw a punch on the picket line, or the striker who deflated the tires on his employer's truck would be subject to a Hobbs Act prosecution and the possibility of 20 years'

17

imprisonment and a $10,000 [now $250,000] fine." *Enmons*, 410 U.S. at 411. Just as use of economic fear becomes "wrongful" under the Hobbs Act only if the defendant has no claim of right to the property at issue, violence or threats of violence are only "wrongful" in the labor context under the Hobbs Act if they are coupled with an *illegitimate* labor objective. Where defendants believed they were pursuing a legitimate labor objective, there is no conspiracy to wrongfully take property and there is no unlawful attempt to wrongfully take an employer's property. Under the rationale of *Sturm*, therefore, it follows that, to prove Hobbs Act extortion in the labor context based on the use or threats of violence and/or economic fear, the government must prove beyond a reasonable doubt *both* that the labor objective being pursued by defendants was not a legitimate labor end *and* that the defendants *knew* that their goal was not a legitimate labor objective.[11]

Neither Count One nor Count Two charges the essential *mens rea* element. Count One of the indictment in this case charges that defendants "conspired to obstruct, delay and affect commerce . . . by extortion in that the defendants and their coconspirators agreed to obtain the property of Company A, a reality television production company, to wit: money to be paid as wages for imposed, unwanted, and unnecessary and superfluous services; with the consent of such entity, their officers, and agents, which consent was induced by the wrongful use of actual and threatened force, violence, and fear of economic and physical harm to Company A and others." Superseding Indictment at ¶13. That Count further charges that "the defendants and their coconspirators agreed to exert influence through the wrongful use of actual and threatened force and fear of physical and economic harm to Company A and others, in order to obtain

---

[11] As addressed in Section V *infra*, the absence of any *mens rea* requirement adds to the unconstitutional vagueness of the Hobbs Act as applied to this case.

wages for such imposed, unwanted, and unnecessary and superfluous services for themselves and other third parties." *Id.* Using similar language, Count Two charges the defendants with attempted extortion through the "wrongful use of fear of physical and economic harm to Company A and others." *Id.* at ¶15.

Count Two charges that the defendants' objective was payment for "unnecessary" services, and they employed the "wrongful" use of force, violence and fear, but it does not charge that defendants knew it (*i.e.*, the wages were "unnecessary" or the use of force was "wrongful"). As for Count One, the conspiracy count, while it has been said that "[i]n an indictment for conspiring to commit an offense, . . . the conspiracy is the gist of the crime, and it is therefore unnecessary to allege all the elements essential to the commission of the offense which is the object of the conspiracy," *United States v. Eirby*, 262 F.3d 31, 38 (1st Cir. 2001), there can be no criminal conspiracy unless there is "an agreement between two or more persons to accomplish an *unlawful* purpose," *United States v. Dellosantos*, 649 F.3d 109, 115 (1st Cir. 2011)(emphasis added), and thus there can be no criminal conspiracy to violate the Hobbs Act in the labor context unless the defendant entered into the agreement knowing that the objective was unlawful, *i.e.*, that the objective of the conspiracy was not a legitimate labor end. Count One is defective for the same reasons that invalidate Count Two.

## V.     **The Hobbs Act, as applied, is void for vagueness.**

As construed in *Enmons*, use or threatened use of violence or economic fear is unlawful under the Hobbs Act only if defendants were not pursuing legitimate labor ends. *See* Section I, *supra*. *Enmons* did not further define "legitimate labor ends" and offered only two examples of what might constitute illegitimate labor ends: the obtaining of personal payoffs, and "exact[ing]

'wage' payments from employers in return for imposed, unwanted, superfluous and fictitious services of workers." *Enmons*, 410 U.S. at 400.  The Court has not further defined the meaning of "imposed, unwanted, superfluous and fictitious."  Making matters worse, the government has charged a variant of that language in this case.  The defendants respectfully submit that the Hobbs Act, as construed in *Enmons* and as applied by the government in this case, is void for vagueness, as it fails to provide persons of ordinary intelligence with fair notice that the conduct charged in this case violates the Hobbs Act.  As such, because the Hobbs Act fails to provide this critical guidance, its application to the defendants in this case violates the Due Process Clause of the Fifth Amendment.

The vagueness doctrine has three "related manifestations."  *United States v. Lanier*, 520 U.S. 259, 265 (1997); *see also Butler v. O'Brien*, 663 F.3d 514, 519 (1st Cir. 2011); *United States v. Councilman*, 418 F.3d 67, 82 (1st Cir. 2005).  First, "the vagueness doctrine bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its applications.'" *Lanier*, 520 U.S. at 266, *quoting Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).  "Second, as a sort of 'junior version of the vagueness doctrine,' . . . the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct covered."  *Lanier*, 520 U.S. at 266 (internal citations omitted); *see Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 408 (2003)("[The Hobbs Act] being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity.") (*quoting Enmons*, 410 U.S. at 411). "Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain

statute, . . . due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266 (internal citation omitted).  All three aspects of the vagueness doctrine are implicated here.

A.     *Vagueness*.

As to the first manifestation identified in *Lanier*, the government violates the fundamental guarantee of the Fifth Amendment Due Process Clause "by taking away someone's life, liberty or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, ___ U.S. ___, 135 S.Ct. 2551 2556 (2015), *citing Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983); *see also Butler v. O'Brien*, 663 F.3d 514, 518 (1st Cir. 2011)("Under the Constitution, 'a criminal statute must give fair warning the conduct that it makes a crime," *quoting Bouie v. City of Columbia*, 378 U.S. 347, 350 (1964)); *Precious Metals Associates, Inc. v. Commodities Futures Trading Comm'n*, 620 F.2d 900, 906 (1st Cir. 1980)("Fair play requires that notice of proscribed conduct be given the potential offender in advance of the offense.").  A statute must give fair warning, "in language that the common world will understand, of what the law intends to do if a certain line is passed." *United States v. Hussein*, 351 F.3d 9, 13 (1st Cir. 2003), *quoting McBoyle v. United States*, 283 U.S. 25, 27 (1931).

It is not enough that a defendant be generally aware that his conduct may be – or even is likely to be – prohibited by *some* criminal statute.  Rather, the statute under which the defendant is prosecuted must provide constitutionally adequate notice that his conduct is criminal *under*

*that statute*.[12]   "The Due Process Clause demands that criminal statutes describe *each particular*

*offense* with sufficient definiteness to 'give a person of ordinary intelligence fair notice that his

contemplated conduct is forbidden.'" *Hussein*, 351 F.3d at 13, *quoting United States v. Harriss*,

347 U.S. 612, 617 (1954)(emphasis added); *see also Lanier*, 520 U.S. at 267 ("[T]he touchstone

is whether *the statute*, either standing alone or as construed, made it reasonably clear at the

relevant time that the defendant's conduct was criminal" (emphasis added)); *Kolender*, 461 U.S.

at 357 ("[A] *penal statute* [must] define the criminal offense with sufficient definiteness that

ordinary people can understand what conduct is prohibited" (emphasis added)); *Connally*, 269

U.S. at 391 ("[T]he *terms of a penal statute* creating a new offense must be sufficiently explicit

to inform those who are subject to it what conduct on their part will render them liable to its

penalties."(emphasis added)); *United States v. Bohai Trading Co., Inc.*, 45 F.3d 577, 581 (1st

Cir. 1995)(issue is "whether *the statute, as enacted by Congress*, gave sufficient notice that the

conduct charged was proscribed" (emphasis added)).  Thus, the issue here is not whether the

defendants understood that they were likely violating some law, such as a state statute

criminalizing assault and battery, but whether they had sufficient notice that they could be

violating the Hobbs Act.  They did not.

---

[12] In *Lanier*, for example, the defendant clearly would have known that his conduct – sexual assaults and oral rapes, 520 U.S. at 261 – was criminal. The question for due process purposes was, however, whether he had fair notice that the *statute under which he was prosecuted* criminalized his conduct.  In *Sabetti v. Dipaolo*, 16 F.3d 16, 18 (1st Cir. 1994), the court noted that "some cases indicat[e] a 'fair notice' violation in a statute that criminalizes (or sets penalties for) obviously *non*-innocent conduct . . . ."(emphasis in original).  Notably, in ruling on the defendant's fair notice claim in *Sabetti*, this court looked to whether the statute of conviction gave fair notice that defendant's conduct was encompassed within it; it did not suggest that a fair notice claim was foreclosed where the defendant clearly knew that he was in the possession of drugs and therefore that his conduct was likely criminal under *some* statute.

Here, the defendants are charged with violating the Hobbs Act because they picketed a production for an hour or two.  They picketed as part of an effort to persuade a company to replace non-union workers with union workers to perform real, not imaginary or fictitious, labor services.  Some people were allegedly called names, but the picketing was overwhelmingly peaceful.  A police officer or two were present for the entire event; not a single arrest was made and no criminal complaints were even filed in the local district court.  Certain conduct in the labor context can, to be sure, plainly violate the Hobbs Act, such as the use or threat of violence by a defendant to obtain a personal payoff or the use or threat of violence to force an employer to engage in featherbedding by hiring more workers than are needed to do the job.  In other labor contexts, however, such as that presented in the case *sub judice*, how are labor representatives to know that pursuing a time-honored labor objective such as picketing to obtain a collective bargaining agreement or otherwise obtaining legitimate employment for members of the union— to replace non-union members—openly in front of town police officers for an hour or two, could possibly violate the Hobbs Act and subject them to potential penalties of up to 20 years in prison (if indeed it does, which defendants contest)?  Indeed, the charged conduct does not even constitute an unfair labor practice under the National Labor Relations Act.  The face of the statute plainly offers no guidance, nor does the construction of the statute by *Enmons*.[13]

Indeed, here, the vagueness of the statute is magnified by the government's manipulation of the language in *Enmons* (dropping "fictitious" and adding "unnecessary") to seemingly charge

---

[13] "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008).  "The indeterminacy of precisely what . . . fact" will render one criminally liable under the Hobbs Act in the labor context is precisely what renders the Hobbs Act unconstitutionally vague in the labor context.

as unlawful a whole new category of conduct.  What does "imposed, unwanted, unnecessary and superfluous services"—the variant language employed by the government in this case—even mean?  Is a service unwanted, unnecessary, and superfluous simply because an employer has already hired non-union workers to fill the available positions and does not want to replace them with union workers?  Is that a federal criminal offense?  The defendants respectfully submit that the Hobbs Act, as construed and applied by the government, is void for vagueness as applied to the facts of this case—ordinary people would not have fair notice that their conduct violates the government's interpretation of the Hobbs Act, and the variant language employed by the government is "so standardless" that it invites arbitrary enforcement.

Adding to the vagueness of the Hobbs Act in the labor context is the lack of a scienter requirement relating to the defendant's knowledge.  The Supreme Court "has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*."  *Colautti*, 439 U.S. at 395 (upholding constitutionality of statute which criminalized the intentional performance of an abortion after the fetus had reached a set gestational point).  Courts have, for example, often found that the inclusion of a knowledge requirement alleviated vagueness concerns.  *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 702 (2000)(vagueness concern alleviated where statute required that defendant knowingly approach within eight feet of another to engage in specified actions); *United States v. Nieves-Castano*, 480 F.3d 597, 603 (1st Cir. 2007)(under the challenged statute, defendant could be convicted only if she knew or reasonably should have know that her possession of a firearm was within a school zone; "this scienter requirement ameliorates any vagueness concerns"); *Hussein*, 351 F.3d at 13 (statute required government to prove beyond a reasonable doubt that defendant

24

knowingly possessed a controlled substance, "and that fact, in and of itself, lessens fair warning concerns"). Here, defendants have argued in Section IV, *supra*, that the Hobbs Act should be interpreted in the labor context to require knowledge that the objective of the action was not a legitimate labor end, but the statute itself, as interpreted by *Enmons*, contains no such requirement.

Lastly, the Court should consider the potential First Amendment implications of over-expansive applications of the Hobbs Act. To "avoid chilling the exercise of First Amendment rights," "the Constitution requires a greater degree of specificity in cases involving First Amendment rights." *National Org. for Marriage v. McKee*, 649 F.3d 34, 62 (1st Cir. 2011); *see also Colautti v. Franklin*, 439 U.S. 379, 390–91 (1979); *Butler*, 663 F.3d at 520 (distinguishing *Kolender* on the ground that its analysis "arises in the First Amendment context in which there are enhanced concerns about arbitrary enforcement under the void for vagueness doctrine where there is the potential for arbitrarily suppressing First Amendment liberties"). "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned v. Rockford*, 408 U.S. 104, 109 (1972).

Union activities such as picketing and other forms of "dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution." *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940); *see also Virginia State Board of Pharmacy v. Virginia Citizens Consumer Counsel, Inc.*, 425 U.S. 748, 762 (1976)("[I]t has long been settled that both the employee and the employer are protected by the First Amendment when they express themselves on the merits of the dispute in order to

influence its outcome."); *Thomas v. Collins*, 323 U.S. 516, 534 (1945)("The rights of assembly and discussion are protected by the First Amendment."); *United States v. Larson*, 807 F.Supp.2d 142, 164 (W.D.N.Y. 2011)("It is undisputable that many activities by union members, including speeches, picketing, and boycotting are entitled to First Amendment protection.").

While use or threats of violence are not protected by the First Amendment, at least part of the activity in which the defendants engaged (if not entirely) was nothing more than lawful, protected picketing.  The interface between protected First Amendment activity in the labor context and use of force to achieve labor objectives requires that, for labor representatives to be subjected to prosecution under the Hobbs Act, the statute must speak considerably more specifically than it does now as to where the line falls between conduct which violates the Hobbs Act and that which does not.  *Enmons* recognized that use of force in labor disputes is a common extension of strikes or picketing activity – so common that legislators feared its inclusion within the ambit of the Hobbs Act – and stated that "it would require statutory language much more explicit than that before us here to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes."  *Enmons*, 410 U.S. at 411.

B.       *Rule of Lenity*.

"The rule of lenity requires ambiguous criminal laws to be interpreted in favor of defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008); *see also United States v. Skilling*, 561 U.S. 358, 410 (2010)("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."); *Perez-Olivio v. Chavez*, 394 F.3d 45, 53 (1st Cir. 2005)("The rule of lenity provides that where there is ambiguity in a criminal statute,

doubts are resolved in favor of the defendant."); *United States v. Tapia-Escalera*, 356 F.3d 181,

188 (1st Cir. 2004); *United States v. Bowen*, 127 F.3d  9, 13-15 (1st Cir. 1997).  Critically, the

rule of lenity "ensures fair warning by resolving ambiguity in a criminal statute as to apply it

only to conduct clearly covered."  *Lanier*, 520 U.S. at 266.

> In various ways over the years, we have stated that when choice has to be made
> between two readings of what conduct Congress has made a crime, it is
> appropriate, before we choose the harsher alternative, to require that Congress
> should have spoken in language that is clear and definite. . . . This principle is
> founded on two policies that have long been part of our tradition. First, a fair
> warning should be given to the world in language that the common world will
> understand, of what the law intends to do if a certain line is passed. To make the
> warning fair, so fair as possible the line should be clear. . . . Second, because of
> the seriousness of criminal penalties, and because criminal punishment usually
> represents the moral condemnation of the community, legislatures and not courts
> should define criminal activity. This policy embodies the instinctive distastes
> against men languishing in prison unless the lawmaker has clearly said they
> should. . . . Thus, where there is ambiguity in a criminal statute, doubts are
> resolved in favor of the defendant.

*United States v. Bass*, 404 U.S. 336, 347–48 (1971)(internal quotation marks and citations

omitted).

Here, the defendants respectfully submit that the rule of lenity prohibits the government's

manipulation of the *Enmons'* language to cover the conduct charged in this case.  Application of

the rule of lenity is especially appropriate given the severe penal consequences which flow from

removing conduct from the ambit of relatively minor state criminal offenses and elevating it to

the status of a 20-year federal felony.  "When choice has to be made between two readings of

what Congress has made a crime, it is appropriate, before [courts] choose the harsher alternative,

to require that Congress should have spoken in language that is clear and definite." *United States*

*v. Rosa-Ortiz*, 348 F.3d 33, 42 (1st Cir. 2003).

Moreover, an expansive reading of the Hobbs Act is not necessary to remedy any of the alleged harms in this matter.  In *United States v. Caldes*, 457 F.2d 74, 77 (9th Cir. 1972), the court reasoned that labor unions must be able to vigorously pursue the interests of their members at all times if their activity is directed toward legitimate ends, and an expansive interpretation of "extortion" used in the Hobbs Act would make criminal the activities of many aggressive labor organizations.  *Id.* at 78.  The court concluded that acts of vandalism during a labor dispute would be more properly and suitably prosecuted in the state courts and doubted whether Congress intended to elevate this type of conduct to the level of a federal offense.  *Id.* at 79.  The severity of the "chest-bumping," "stomach-bumping," and name calling allegations in this case simply does not warrant subjecting the defendants to severe federal penalties.  Picketing is a legitimate labor objective and is every bit a part of legitimate labor ends as are strikes.  The law is settled that picketing for the purpose of compelling an employer's compliance with prevailing area wage and benefit standards; *i.e.*, "area standards" picketing, is not barred by Section 8(b)(7) of the NLRA.[14]  Likewise, union representatives can picket for recognitional purposes for less than 30 days, never mind for a "morning," which is clearly the case here.  *See* 29 U.S.C §8(b)(7). The Superseding Indictment acknowledges that the defendants were seeking to obtain wages for

---

[14] Teamsters Local 25 is a party to a multi-employer agreement with the New England Motion Picture and Television Producers Association for the period 2013 to 2018 which covers rates of pay and terms and conditions of employment for drivers, mechanics, chauffeurs, and helpers in Massachusetts, New Hampshire, Maine, and Vermont. Under the terms of Teamsters Local 25 collective bargaining agreement in the theater production industry, production companies are not required to hire any certain number of Local 25 members. Rather, if they hire employees to perform work covered by the agreement, they are required to pay certain wages and abide by the agreement with regard to the covered employee's terms and conditions of employment.

union members and acknowledges that the defendants were picketing in order to get a labor agreement.  Superseding Indictment at ¶¶2, 5.

      C.    *Retroactive Application*.

While, as defendants have acknowledged, certain conduct in the labor context plainly does fall within the strictures of the Hobbs Act, in many instances, whether the defendants have violated the Hobbs Act will depend on the *post hoc* determination by a judge or jury regarding whether their labor objective was a legitimate one.  In such cases, particularly absent a requirement that the government prove that defendants knew that they were not pursuing a legitimate labor end, the vagueness dangers inherent in retroactive application of after-the-fact determinations that conduct was properly prosecuted under the Hobbs Act remain a valid concern.  As noted, "although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, . . . due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."  *Lanier*, 520 U.S. at 266 (internal citation omitted).  Here, applying the government's manipulated language to criminalize the defendants' conduct would run afoul of this due process principle.

**VI.**    **Conclusion.**

For all the foregoing reasons, the Superseding Indictment should be dismissed.

Respectfully Submitted,
MARK HARRINGTON,
By His Attorney,

**/s/ Robert M. Goldstein**
Robert M. Goldstein, Esq.
Mass. Bar No. 630584
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

Respectfully Submitted,
JOHN FIDLER,
By His Attorney,

**/s/ Timothy P. O'Connell**
Timothy P. O'Connell
BBO #376725
C-8 Shipway Place
Charlestown, MA  02129
(617) 285-3215
tpocsr@gmail.com

Respectfully Submitted,
ROBERT CAFARELLI,
By His Attorney,

**/s/ Carmine P. Lepore**
Carmine P. Lepore
BBO #564603
One Sprague Street
Revere, MA 02151
781-286-8800
CL524@aol.com

Respectfully Submitted,
MICHAEL ROSS,
By His Attorney,

**/s/ Kevin L. Barron**
Kevin L. Barron, Esq.
BBO #550712
5 Lexington St., No. 3
Boston, MA 02129-3114
(617) 407-6837
kevinbarronesq@gmail.com

Respectfully Submitted,
DANIEL REDMOND,
By His Attorney,

**/s/ Oscar Cruz, Jr.**
Oscar Cruz Jr.
BBO #630813
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
Oscar_Cruz@fd.org

Dated: November 23, 2015

### Certificate of Service

  I, Robert M. Goldstein, hereby certify that on this date, November 23, 2015, a copy of the foregoing document has been served via the Electronic Court Filing system on all registered participants, including Assistant U.S. Attorneys Laura Kaplan and Kristina Barclay.

          **/s/ Robert M. Goldstein**
          Robert M. Goldstein