UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Cr. No. 15–10300-DPW |
| | ) |
| (1)  JOHN FIDLER, | ) |
| (2)  DANIEL REDMOND, | ) |
| (3)  ROBERT CAFARELLI, | ) |
| (4)  MICHAEL ROSS, and | ) |
| (5)  MARK HARRINGTON | ) |
| | ) |
| Defendants | ) |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS INDICTMENT
(LEAVE TO FILE GRANTED ON 12/16/15)**

The United States of America, by and through its attorneys, Carmen M. Ortiz, United

States Attorney, and Assistant U.S. Attorneys Laura J. Kaplan and Kristina E. Barclay, submit

this opposition to defendants' Motion to Dismiss Indictment (Docket No. 60) (the "Motion").

Defendants argue for dismissal of the Indictment on the grounds that: (1) defendants' wrongful

conduct is protected under *United States v. Enmons*, 410 U.S. 396 (1973); (2) the Indictment

fails to allege a *mens rea* element of the offense; and (3) the Hobbs Act is void for vagueness.

Because all three arguments are meritless, and involve questions of fact for a jury to determine,

the Court should deny defendants' motion.

## FACTS

In the spring of 2014, locations were scouted for a reality television show produced by

Company A ("the Show") to film its twelfth season in the Boston area, where it had never filmed

before.   A number of filming locations were chosen, including the Museum of Science, Fenway

Park, Cheers, the Omni Parker House, Menton restaurant, and Emerson College.   Company A is

a non-union company, and most reality television shows are produced using non-union crews. Company A was not a signatory to any collective bargaining agreement with Teamsters Local 25, and it had already hired all of its labor.   Company A did not need any work performed by Local 25 members.

On June 5, 2014, Company A was filming an episode of the Show at the Revere Hotel in Boston.   A number of production vehicles were parked outside of the hotel on the street. Defendant DANIEL REDMOND ("REDMOND"), a member of Teamsters Local 25, showed up at the location and approached a location scout ("the location scout") who was employed by Company A.   The location scout knew REDMOND because he had worked with REDMOND on other productions.   REDMOND, who was upset that the Teamsters had not been hired to drive the production vehicles, told the location scout that he should have called REDMOND and stated, "This is bullshit."   REDMOND demanded to speak to the producers and the location scout provided REDMOND with the telephone numbers of two of the producers.

One of Company A's producers came down to speak with REDMOND.   REDMOND told the producer that he/she needed to contact defendant MARK HARRINGTON ("HARRINGTON")[1], the "right hand man" of Local 25 president Sean O'Brien ("O'Brien"). The producer reached HARRINGTON, who stated that he did not care about the reality television show and all that he cared about was them "hiring some of his guys on the show."   At some point, a conference call was scheduled with HARRINGTON and O'Brien for June 10, 2014.   REDMOND threatened to shut down the production and warned the producer that if Company A did not make a deal, Local 25 members would start following them and would also

---

[1]  HARRINGTON is the secretary treasurer of Local 25.   Despite defendants' claim to the contrary (Motion at 8), HARRINGTON was the only union official on the scene and at no time did he try and negotiate a labor contract. In fact, he told the producer he was only interested in getting his guys some work.

start picketing.

Later that same evening, the location scout received a telephone call from defendant ROBERT CAFARELLI ("CAFARELLI"), also a member of Local 25.   CAFARELLI inquired about the location scout's involvement with the Show.   The location scout told CAFARELLI that he had quit the production.   CAFARELLI stated, "that was the smartest thing you had done in 2014."   Again, there was no discussion about negotiating a contract.

Thereafter, REDMOND called the location scout and demanded all of the details about the production.   REDMOND told the location scout, "If you want this to go right for you or go away, I need this."   The location scout also received a text message from REDMOND, on June 6, 2014, that read, "Help me out and I'll make it all good with you on this!   Where are tgey [sic] today and where will they be on Monday?"   The location scout provided REDMOND with the information that he requested because he wanted to give REDMOND whatever he needed to get REDMOND away from him.

The location scout continued to assist the production for the next few days; however, he refused to show up on set.   He told the producer that he was being harassed and threatened by the Teamsters.

The Show was scheduled to film at the Omni Parker House Hotel on June 10, 2014.   On June 9, 2014, the producer received a call from O'Brien and HARRINGTON cancelling the previously scheduled June 10th conference call.   Later that evening, a representative of the Omni Parker House Hotel contacted one of the producers and stated that they did not want the Show filming at the hotel the next morning because they did not want to be picketed by the Teamsters.   Company A then scrambled to find a new location for filming the next morning and

3

settled on Restaurant A.

On the morning of June 10, 2014, the producer received a voicemail from O'Brien, who stated that they knew the Show was at Restaurant A, and "we will be sending fifty guys down there to picket."   The producer contacted the owner of Restaurant A, and they coordinated the hiring of a police detail.

In the early morning hours, the production staff arrived at Restaurant A and started to unload equipment from the trucks and move it into the restaurant.   At approximately 9:00 am, all five defendants showed up at Restaurant A despite four of them having been hired to work as drivers on the filming of *Black Mass* that day at another job site location for another employer.

Several Teamsters entered the production area and began walking in lockstep toward the door of the restaurant.   Without using their hands, the Teamsters bumped their stomachs and chests into the production assistant and several others.   At this time, the police officer assigned to the detail came over and escorted the Teamsters out of the production area and back onto the sidewalk.

A security guard who was hired to help protect equipment and staff was standing at the front door of the restaurant when several Teamsters entered the top of the parking lot and walked down the hill directly at him.   One of the Teamsters approached him and the two stood nose to nose.   The Teamster was very close but not touching.   The Teamster stated, "Go ahead and hit me."   The security guard looked over to the police officer who was in the street and asked for assistance.   The police officer moved the Teamsters to the sidewalk.

Throughout the June 10 incident, the Teamsters swore at the production crew and called them "scabs" and "cunts."   They also used homophobic slurs such as "pickles" and "faggots,"

and racial slurs such as "towel head" and "brown Ellie" (in reference to one of the production crew's skin color).   A video and audio tape of the incident captures some of defendants' threatening behavior, including CAFARELLI walking up to a producer and cracking his knuckles in a menacing manner.   CAFARRELLI can be heard saying to the producer, among other things, "I'm not shaking.   I don't have to call you a name.   You already know what you are."

Defendants continued to act in a threatening manner and threatened to cause physical harm to the production staff and crew members if they entered Restaurant A.   The production crew was scared, threatened, and intimidated by defendants' actions.   The Teamsters blocked entry to the set and tried to prevent trucks from getting through.   At one point, when a production assistant came to help, a Teamster bumped him so forcefully that he was pressed up against the hood of the vehicle.   At this time, the police officer again came over and broke up the incident.

One of the celebrity hosts of the Show arrived at the location in a minivan.   When the driver of her van attempted to enter the parking lot, defendant FIDLER blocked the driveway. FIDLER stuck his arm in the van through the window and stated, "Lookie what we have here." After referring to the driver of the mini-van as a "pickle," FIDLER stated, "I'll smash your pretty little face."   The host was terrified and ordered the van driver to back out and find another way to enter Restaurant A.

Sometime that morning, a local food company delivery truck pulled up to Restaurant A to make a delivery.   As the delivery man went to the back of the truck to unload the product, some Teamsters yelled at him not to make the delivery.   One Teamster came up to the delivery man

5

and put money in his hand and told him to leave.    The delivery man refused to take the money. He then got back into his truck and a detail police officer helped him and the driver back the truck out of the parking lot.    The delivery was made later in the day by another employee of the company in an unmarked sedan.

Sometime that morning, tires of at least nine vehicles belonging to the production company were slashed.    One vehicle had a bent antennae and another was sprayed with an orange substance.    All of the vandalized vehicles were rented by the production company or belonged to members of the production staff.

Despite defendants' claims that they were trying to negotiate a contract or were trying to "replace" non-union workers with union workers, the government expects that the evidence at trial will demonstrate that such was never defendants' motivation.    First, defendants were not authorized to negotiate a contract with Company A on behalf of its employees.    Second, HARRINGTON himself disclaimed any interest in the Show to the producer.    Third, the evidence will demonstrate that Company A never intended to replace its workers – some of whom travelled to Boston from out-of-state to work on the Show – with Teamsters.    Moreover, the fact that four defendants were actually employed and working on the production of *Black Mass,* at a different location and for a different employer at the time that they were engaged in their extortionate activities, clearly demonstrates that the defendants were not seeking to replace the Show's non-union workers with themselves.

In addition, several months after the incident, O'Brien, with counsel present, was interviewed by the Milton Police Department about the incident at Restaurant A.    O'Brien stated that what happened in Milton "was not a planned event through Local 25."    He further

6

stated that there were "never any signs [sic] ups for an organized picket line in Milton" against the reality show and "[w]hatever union members that were causing the problems in Milton came on their own."    Although on June 9, O'Brien did email a Show producer an unexecuted collective bargaining agreement which covered motion picture and television productions, none of the employers associated with the production of the Show are signatories to this agreement and none of their agents were requested by any of the defendants to sign such an agreement with Local 25.

Finally, during the incident at Restaurant A, Company A consulted its attorneys who were preparing to seek an injunction against Local 25 with the National Labor Relations Board ("NLRB").    On the afternoon of the incident at Restaurant A and before filing a complaint, the attorney spoke with Local 25's attorney and suggested that he speak with his client.    Local 25's attorney later reached out to Company A's attorney and stated unequivocally that Local 25 had no interest in representing its employees and "although the union has no connection with the persons who misbehaved today," he nonetheless expected "that they would not misbehave tomorrow."    Local 25's refusal to support defendants' conduct, through O'Brien and its attorney, is further evidence that defendants were engaged in extortion and not any kind of protected activity under *Enmons*.

Defendants' objective was not to organize the Show's employees, or secure a collective bargaining agreement with Company A, but rather to shut down the Show unless money was paid to Local 25.    Indeed, one defendant, in his post-arrest statement, admitted that they were just trying to send a message.

Defendants were also not engaged in area standards picketing to inform the public about

7

substandard wages and working conditions.    The defendants carried no signs, and did not

distribute leaflets, as is typical of picketers in an area standards picket.    Nor were the defendants

engaged in recognitional picketing, as Local 25 had not obtained the necessary authorization to

represent the show's employees.[2]   This was picketing for *additional workers*; for services that

were not needed but rather were imposed, unwanted and superfluous.    Indeed, Company A had

no intention of allowing the defendants to work or otherwise replacing its own workers with

union members and understood that they would have to hire additional labor to make the

Teamsters go away – to stop them from disrupting their business.

Defendants' threats of economic harm and physical violence were made in order to

obtain money for work that was unwanted, unnecessary, and superfluous and are therefore not

protected under the claim of right defense discussed in *United States v. Enmons*.    Wage

demands for unwanted, unnecessary and superfluous labor are illegitimate labor objectives which

render the actual or threatened use of force violence or fear, including fear of economic harm,

"wrongful" for purposes of extortion in violation of the Hobbs Act.

## ARGUMENT

### 1.  Defendants' Conduct Violates the Hobbs Act

Defendants mischaracterize the June 10, 2014 incident at Restaurant A as simply

peaceful picketing for a legitimate union objective of obtaining replacement union workers who

would be paid wages and benefits pursuant to a collective bargaining agreement with Teamsters

Local 25.    However, there was nothing peaceful about the picketing and nothing legitimate

---

[2]  Peaceful picketing for the purposes of protesting an employer's failure to pay prevailing wages and benefits in the area of the job site or to picket for recognitional purposes for less than 30 days is permitted by the National Labor Relations Act ("NLRA"), under certain circumstances, at 29 U.S.C. § 158(b)(7).    (Motion at 28).    However, whether defendants' conduct is a violation of the NLRA is irrelevant for purposes of a criminal prosecution for extortion.

about defendants' objectives.    Defendants' argument fails because their conduct, as alleged in

the Indictment, falls squarely within the Hobbs Act.

    **a.   The Hobbs Act and *Enmons***

An analysis of the Hobbs Act must start with the Supreme Court's decision in *United*

*States v. Local 807*, 315 U.S. 521 (1942).    The defendants in *Local 807* included members of

the New York City truck drivers' union who used violence and threats to obtain union wages

from the owners of out-of-state trucks making deliveries to the city.    The victim owners had

employed out-of-state drivers who were not members of Local 807 to make the deliveries, but in

some instances those drivers were forced at the city limits to turn over the trucks to Local 807

members, who would drive the trucks to their destinations.    In other instances, the defendants

did nothing in exchange for the money paid, either because the defendants refused or never

offered to work, or because the victim owners rejected the defendants' offers to do the work.

*Id.* at 526.    Reversing the defendants' convictions under the Anti-Racketeering Act of 1934 (the

"1934 Act"), which prohibited obtaining valuable consideration by force, violence or coercion,

the Court held that the charged conduct fell within a statutory exception for "the payment of

wages by a bona-fide employer to a bona-fide employee."    *Id.* at 534-35.

Congress acted quickly to correct the result in *Local 807* by eliminating the statutory

wage exception in the 1934 Act with the Hobbs Act, now codified at 18 U.S.C. § 1951.    60 Stat.

420 (July 3, 1946).    *United States v. Green*, 350 U.S. 415, 419 n. 5 (1955) (Hobbs Act's

legislative purpose was to overturn *Local 807* and abrogate exception in 1934 Act).    Under the

Hobbs Act, a person can be prosecuted for inducing another person's consent to part with

property through the "wrongful" use of actual or threatened force, violence or fear, including fear

of economic harm.

In *Green*, the Court confirmed that Congress had succeeded in overruling *Local 807* with the Hobbs Act, and held that the allegations of the indictment in that case fell within the terms of the Hobbs Act.   *Id.* at 421.   The indictment charged that the defendants attempted to use actual and threatened force, violence and fear to obtain from an employer "money, in the form of wages to be paid for imposed, unwanted, superfluous and fictitious services of laborers commonly known as swampers, in connection with the operation of machinery and equipment then being used and operated by" the employer in the execution of a maintenance contract.   *Id.* at 417 (quoting from indictment).

The Supreme Court next considered the reach of the Hobbs Act in *Enmons*.   The defendants in *Enmons* were members and officials of labor unions who used violence and fear of economic harm in seeking a new collective bargaining agreement with an employer on behalf of union-represented employees.   410 U.S. at 397-98.   After considering the history of the Hobbs Act, including *Local 807*, the Court held that the defendants' conduct did not fall within the scope of the statute.   The Hobbs Act "does not apply to the use of force to achieve legitimate labor ends" because the word "'wrongful' has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property."   *Id.* at 400-01.

To distinguish the *Enmons* defendants' lawful behavior, the Court provided two *examples* of conduct properly within the reach of the Hobbs Act: (1) where union officials threaten force or violence to obtain personal payoffs, and (2) where unions use fear of violence or economic harm to obtain wage payments for "imposed, unwanted, superfluous and fictitious services" of

workers.    410 U.S. at 400 (internal quotes omitted) (citing *Green*, 350 U.S. at 417 and *United States v. Kemble*, 198 F.2d 889 (3rd Cir. 1952)).    However, contrary to defendants' argument, and discussed in further detail below, the *Enmons* Court did not hold that these were the *only* scenarios which fell within the ambit of the Hobbs Act, nor did it hold that the government must prove that the services for which wages were extorted must be "imposed, unwanted, superfluous *and* fictitious."    Rather, the Court was merely quoting the indictment language it had previously approved in *Green*.

The specific conduct at issue in *Enmons* – and the only conduct the Court held was not proscribed by the Hobbs Act – was "violence during a strike to achieve legitimate collective bargaining objectives."    In *Enmons*, the Supreme Court explained what it meant by wages for "unwanted and superfluous" services by discussing its prior decision in *Local 807* as follows:

> In *United States v. Local 807* . . . the Court held that [the former wage] exception covered the members of a New York City truck drivers' union who, by violence or threats, exacted payments for themselves from out-of-town truckers in return for the unwanted and superfluous service of driving out-of-town trucks to and from the city.    The New York City teamsters would lie in wait for the out-of-town trucks, and then demand payment from the owners and drivers in return for allowing the trucks to proceed into the city.    The teamsters sometimes drove the arriving trucks into the city, but in other instances, the out-of-town truckers paid the fees but rejected the teamsters' services and drove the trucks themselves.    In several cases there was evidence that, having exacted their fees, the city drivers disappeared without offering to perform any services at all.    . . .    The Court held that the activities of the city teamsters were included within the wage exception to the Anti-Racketeering Act although what work they performed was unneeded and unwanted, and although in some cases their work was rejected.

*Enmons,* 410 U.S. at 401-402 (case citations omitted and words in brackets added).

In other words, the illegitimate labor objectives which Congress sought to prohibit by enactment of the Hobbs Act in 1946 included not only the obtaining of a wage payment to a Teamster driver for services not performed, as when the out-of-town truckers paid the Teamster

drivers but continued to drive their own trucks, but also the obtaining of a wage payment for

"unwanted and superfluous" service as when the Teamster drivers actually drove the trucks

despite the out-of-town truckers' availability to drive their own vehicles.

**b. Post-*Enmons* Decisions**

Lower court decisions since *Enmons* confirm that defendants' conduct in this case falls

squarely within the Hobbs Act.   In *United States v. Robilotto*, 828 F.2d 940 (2d Cir. 1987), the

Second Circuit upheld the Hobbs Act convictions of labor union officials who had demanded

wage payments from movie producers for the "unwanted, unnecessary and fictitious services of

employees known as 'cover drivers'."   On appeal, the Second Circuit explained that, in addition

to being unwanted and unnecessary, the proffered work of the cover drivers was also a sham and

tantamount to a wage exaction for fictitious services not performed and not to be performed:

> Apparently conceding that the cover drivers were both superfluous and fictitious,
> Robilotto argues that the demand to pay cover drivers was neither imposed upon, nor
> unwanted by, Universal because Universal eventually "agreed" to pay the cover drivers.
> However, Universal consented to payment of those salaries only after threats of labor
> unrest made by Civitello and later by Robilotto.   Under Robilotto's singularly circular
> logic, once Universal consented to making extortionate payments upon pain of labor
> strife, that consent would then evidence Universal's willingness to accept the previously
> unwanted contract term.   At most, Universal's subsequent agreement to hire the cover
> drivers demonstrates only that appellants' extortion was successful.   Moreover, the
> cover drivers at issue here, for the most part, were not members of the union, performed
> no work, and were incapable of performing the jobs that they purportedly were covering.
> It would be difficult to imagine a more obvious instance of imposed, unwanted,
> superfluous and fictitious labor services.   *See United States v. Green*, 350 U.S. 415, 417,
> 76 S.Ct. 522, 524, 100 L.Ed. 494 (1956).   Appellants' attempts to force Universal to hire
> cover drivers clearly fall within the type of illegitimate labor activity proscribed in Green.
> We hold, therefore, that the Hobbs Act indictment against appellants stated a criminal
> offense, and that the exception envisioned in *Enmons* for legitimate union activity is
> inapplicable to the instant case."

*Robilotto*, 828 F.2d at 945.

In a more recent decision, the Second Circuit upheld the Hobbs Act conspiracy

convictions of minority coalition leaders and their organized crime associates in a prosecution of labor-related abuses in the construction industry.   *United States v. Mulder,* 273 F.3d 91 (2d Cir. 2001).   Defendant coalition leaders had used their reputation for violence, assistance from known organized crime family members and associates, and threats of work stoppages to obtain from various construction employer firms wages for no show jobs, real jobs, additional labor, and replacement labor.

In discussing the scope of illegitimate wages for unwanted or superfluous employees, the trial court's instruction in *Mulder* also had explained that the *Enmons* claim-of-right defense would not apply to using coercive or extortive means in order to force an employer to place a person on his or her payroll solely in exchange for preventing that person or other people or organizations he is associated with from disrupting work.   The Court of Appeals explained:

> [t]he labor exception assumes that the employer genuinely needs workers but has decided to hire non-union or non-minority workers.   If the coalition creates not only the spur to hire a minority worker but also the need to hire an otherwise unneeded worker or coordinator by its violence or threats of violence, its actions do not fall within the labor exception.

*Mulder*, 273 F.3d at 106 n. 2.

Moreover, in the context of union organizing campaigns, lower courts have held that the use of actual or threatened violence to induce an employer's consent to pay union-scale wages and benefits pursuant to a labor contract are "wrongful" and outside the *Enmons* claim of right defense.   For example, in *United States v. Larson*, 807 F. Supp. 2d 142 (W.D. N.Y. 2011), the district court upheld the legal sufficiency of a labor racketeering indictment charging officers and members of an operating engineers local union with conspiracy and attempted extortion of various construction industry employers and their existing workers.   The alleged extortion

13

racketeering acts were based on both violations of the Hobbs Act and New York State law (N.Y. Penal Law § 155.05).   The primary issue was whether the *Enmons* claim of right defense applied to the defendants' use of violence and economic fear resulting from physical injury and damage to property while attempting to organize non-union employees and obtain pre-hire labor contracts from building contractors in western New York State between 1997 and 2007.

In ruling that the claim of right defense did not shield the defendants' alleged violent conduct from prosecution under the Hobbs Act, the district court followed the view that the *Enmons* decision is limited to its facts involving violence committed during an economic strike by employees represented by a labor union.   The court explained that in the *Enmons* prosecution, a legitimate strike situation, the union has a lawful platform on which to seek higher wages and better terms for its members.   However, when a union pursues agreements with new employers through primary tactics of violence, threats, and intimidation, it does not have a lawful platform on which to claim the property of the employer.   The use of such tactics is therefore "wrongful" under the Hobbs Act.   *Larson,* 807 F.Supp.2d at 157 (citing *A. Terzi Productions, Inc. v. Theatrical Protective Union,* 2 F.Supp.2d 485 (S.D.N.Y. 1998)).

In *A. Terzi Productions*, the District Court sustained a civil RICO complaint filed by an employer alleging Hobbs Act extortion based on picketing violence directed at organizing its non-construction industry employees whom the union defendant did not represent for purposes of collective bargaining.   Then District Court Judge Sotomayor concluded that the *Enmons* claim of right defense did not apply:

> . . .where the union is not authorized to represent any of the employer's employees. I conclude that *Enmons* does not extend that far. . . .   It is a basic tenet of federal labor law that a union has no right to demand that an employer recognize or bargain collectively with the union unless it has first obtained the majority backing of that

14

employer's employees and been certified as their bargaining representative.   . . .
Defendants' collective-bargaining demands of ATP, therefore, were not legitimate and
*Enmons* does not apply.   While *Enmons* might apply to violence incident to the
recognition and bargaining demands of a properly authorized union, because in that
instance the employer has a legal duty to recognize and bargain with the union, see 29
U.S.C. § 158(a)(5), that is not this case. . . . [F]orcing a collective bargaining agreement
upon unwilling employees and their employer is "wrongful" within the Hobbs Act's
meaning; the union is an outside meddler with no lawful claim to the employer's
property.

*A. Terzi Productions*, 2 F.Supp.2d at 506-507.

Here, defendants did not represent Company A's employees, and they admit that they

were not striking to achieve legitimate collective bargaining objectives.   (Motion at 10, n.4)

(distinguishing *Enmons* as having arisen in the context of a strike).   Defendants further concede,

as they must, that "certain conduct in the labor context . . . can plainly violate the Hobbs Act,

such as the use or threat of violence by a defendant to obtain a personal payoff of the use or

threat of violence to force an employer to engage in featherbedding by hiring more workers than

are needed to do the job."   (Motion at 23).   The use of actual and threatened force, violence

and fear in support of a demand for the hiring of more workers than are needed to do the job is

exactly what happened in in this case.

Unable to find a foothold in the legislative history or Hobbs Act case law, defendants

rely on the district court decision in *United States v. Kirsch*, 2015 WL 14722122 (W.D.N.Y.

Mar. 31, 2015), which is easily distinguished from this case.   The district court in *Kirsch*

considered motions for a judgment of acquittal and for a new trial filed by defendant Mark

Kirsch, an engineers' union business manager charged with RICO conspiracy and violations of

the Hobbs Act.   The indictment alleged that the defendants extorted or attempted to extort

"wages and benefits to be paid . . . for unwanted, unnecessary, and superfluous labor" from

construction contractors.   *Kirsch*, 2015 WL 1472122, at 2.   Specifically, Kirsch used actual

and threatened violence to force construction employers to enter into collective bargaining

agreements with the engineers' union, thereby replacing non-union workers with union workers.

*See Larson*, 807 F.Supp. at 156 (Larson and Kirsch were codefendants; court in *Larson* upheld

sufficiency of *Kirsch* indictment).   The district court held that "unwanted, unnecessary, and

superfluous labor" does not include wages paid to union workers who replace non-union workers

to perform genuine, needed work.   *Kirsch*, 2015 WL 1472122 at *5.

        Defendants ignore a critical distinction between *Kirsch* and this case: *Kirsch* involved

collective bargaining in the construction industry.   Whereas the NLRA generally requires that

employers obtain majority support from employees before entering into a collective bargaining

agreement, the statute contains a limited exemption for the construction industry.   29 U.S.C. §

158(b) and (f).   Therefore, the defendants in *Kirsch* were not legally prohibited from seeking an

agreement from the construction employers to replace their non-union workers with union

workers.   In this case, however, because defendants did not have majority support from any of

Company A's employees, they could not negotiate a contract with Company A and the jobs they

were seeking could not have been replacement jobs.

        Company A did not have a labor contract with Local 25 or any other legal obligation to

hire transportation workers who were members of Local 25.   Accordingly, for the reasons

explained in *A. Terzi Productions*, absent circumstances indicating that Local 25 represented a

majority of the employer's existing employees and was entitled to bargain with the employer

about a labor contract requiring that transportation employees be members of Local 25 and be

paid union-scale wages and benefits, the defendants' use of actual and threatened use of violence

16

was "wrongful" for purposes of Hobbs Act extortion inasmuch as they had no claim of right to the property which they sought to obtain.

The holdings in *Enmons* and lower federal courts have made clear that the *Enmons* claim-of-right defense does not apply to using extortionate means to force an employer to place a person on his or her payroll solely in exchange for preventing that person or other people or organizations he is associated with from disrupting the work site.

Company A did not have a labor contract or project labor agreement or any other legal obligation to hire transportation workers who were members of the Teamsters union.    For the reasons explained in *A. Terzi Productions*, absent circumstances indicating that Local 25 represented a majority of the employer's existing employees and was entitled to bargain with the employer for a labor contract requiring that transportation employees be members of Local 25 and be paid union-scale wages and benefits, defendants' use of actual and threatened use of violence was "wrongful" for purposes of Hobbs Act extortion inasmuch as they had no claim of right to the property which they sought to obtain.    Defendants' argument that their activity was a legitimate union objective is further obviated by Local 25 president O'Brien's statements to the police, his attorney's statements, and additional evidence the government will offer that such activity was not authorized by the union.

Moreover, the facts in this case do not come close to providing protection for defendants under *Enmons*.    This was not a legitimate strike by union-represented employees seeking higher wages and benefits in a new labor contract as was present in *Enmons.*    Defendants had no lawful platform upon which to seek higher wages or better terms for the employees of Company A.    Defendants had no right to demand that Company A recognize or bargain collectively

unless they first obtained majority backing from Company A's employees and were certified as

or were voluntarily recognized by Company A as the collective bargaining representative of its

employees.    The Show did not need transportation work performed by defendants or other

members of Teamsters Local 25 for whom union-scale wages and employee benefits were

demanded because it had hired its own employees to perform such labor.    The hiring and

payment of *additional* union workers under such circumstances would have rendered their

services "unnecessary and superfluous."    Thus, defendants' use of actual and threatened

violence in support of the hiring of additional workers to perform "unwanted, unnecessary and

superfluous" labor was "wrongful" for the reasons explained in *Enmons* and *Mulder*.[3]

### c.  The Government is Not Required to Prove the Jobs Were Fictitious

Ignoring the Court's reasoning and the cases cited by the Supreme Court, defendants

argue that the *Enmons* decision requires that wrongful wage demands for labor services must be

not only imposed, unwanted, or superfluous, but also "fictitious."    (Motion at 14-15).

However, defendants' insistence that the government plead (and prove) that the jobs at issue did

not exist is a misreading of *Enmons*.    As set forth above and as articulated in *Enmons*, the

legislative history of the Hobbs Act demonstrates Congress' clear intent to criminalize the

exaction of wages for imposed, unwanted, and superfluous services as well as wages for

fictitious services not performed and not to be performed.

In fact, defendants' argument that defendants who exact wages for actual jobs, even if

their work is unwanted and unneeded, may invoke the *Enmons* claim of right defense would

---

[3]  Defendants cannot find safe harbor under Judge Casper's recent jury instructions in *United States v. Perry* and *United States v. Deamicis* with respect to determining when conduct is a legitimate or illegitimate labor objective. While Judge Casper did instruct the jury that, "obtaining jobs and wages for union members is a legitimate union objective," she also told the jury that, "obtaining personal payoffs or payment for imposed, unwanted and superfluous work *or* imposed, unwanted and fictitious work" is not.

revert the law of labor extortion to its status after the decision in *Local 807*, the very decision which prompted enactment of the Hobbs Act.    The very purpose of the Hobbs Act was to overturn *Local 807* and "shut off the possibility…that union members could use their protected status to exact payments from employers for imposed, unwanted, and superfluous services." *Enmons*, 410 U.S. at 403.    *Enmons* was not just talking about made up or fictitious jobs but rather work which was to be actually performed, but unnecessary.

The Court in *Local 807* specifically considered instances where the defendants' services were not wanted or needed, and instances where their services were rejected because the out-of-town drivers would drive the trucks into the city.    315 U.S. at 535-536; *Enmons*, 410 U.S. at 402 (interpreting *Local 807* as holding that exception covered "union [members] who, by violence or threats, exacted payments for themselves from out-of-town truckers in return for the unwanted and superfluous service of driving out-of-town trucks to and from the city"); *Green,* 350 U.S. at 419 ("We held in *Local 807* that this exception covered members…offering superfluous services to drive arriving trucks to their city destination…"); *United States v. Culbert,* 435 U.S. 371, 376-377 (1978) (characterizing services performed by *Local 807* defendants as "undesired and often unutilized").    In rejecting *Local 807* with the Hobbs Act, Congress characterized the teamsters' activities legalized under *Local 807* as "compelling the truckers to pay day's wages to local union drivers whose services were neither wanted nor needed;" "stickup men [who] disappeared as soon as the money was paid without rendering or offering to render any service;" and "nothing short of hijacking, intimidation, extortion, and out-and-out highway robbery."    *Enmons*, 410 U.S. at 403 (quoting Congressional record).    The Hobbs Act was enacted for the specific purpose of criminalizing these activities excepted from

the 1934 Act.   The Supreme Court observed in *Enmons* that, "as frequently emphasized on the floor of the House, the limited effect of the [Hobbs Act] was to shut off the possibility opened up by the *Local 807* case, that union members could use their protected status to exact payments from employers for imposed, unwanted, and superfluous services."   410 U.S. at 403-404.

Defendants' argument that *Enmons* requires the government to plead and prove that the labor is "imposed, unwanted, superfluous *and* fictitious" is also not borne out by *United States v. Kemble*, 198 F.2d 889 (3rd Cir.1952).   In *Kemble,* the Third Circuit affirmed a conviction under the Hobbs Act of a Teamsters' business agent who demanded that a non-union-affiliated truck operator hire and pay a union member to unload a truck, and where his demand was not directed at the hiring of additional employees to do work not ordinarily performed by the employer.   198 F.2d at 890.   Instead, the demand was directed at the payment of union-scale wages to an additional employee for work already being performed by the non-union truck operator.   The Supreme Court in *Enmons* specifically approved the limited holding of *Kemble* that "the payment of money for imposed, unwanted and superfluous services . . . is within the language and intendment of the statute."   410 U.S. at 409.   Kemble did not require that the jobs be fictitious, nor does *Enmons*.

Accordingly, defendants' claim that the Hobbs Act does not reach union members who coerce employers into paying for labor they do not need or want is wrong.   The legislative history, as set forth by the Supreme Court, makes clear that the very purpose of the Hobbs Act was to foreclose any argument that it is lawful behavior for unions to use fear and coercion, including economic fear, to obtain wages for imposed, unwanted, or superfluous services.

Correctly read, *Enmons* supports the government's position that the use of economic

coercion to obtain wages for unwanted and superfluous services is prohibited.    Exacting wages

for services that are real but unwanted is an illegitimate objective.    *See United States v. Markle*,

628 F.3d 58, 62 (2d Cir. 2010) (noting that *Enmons* Court found that "exaction, by threats and

violence, of wages for superfluous services" was illegitimate objective).    Similarly, the *Enmons*

Court defined "legitimate union objectives" as including the obtaining of "higher wages in return

for genuine services which the employer seeks."    *Enmons*, 410 U.S. at 400.    Based on this

language, a "legitimate union objective" does not exist simply because the services were genuine

(*i.e.*, real and not fictitious); they must also be necessary and sought by the employer (*i.e.*, not

unwanted and superfluous).    It follows that exacting payment for unwanted, unnecessary and

superfluous services is an illegitimate labor objective, obviating any need for proof of

fictitiousness.

    As set forth above, the use of the word "and" between the words "superfluous" and

"fictitious" at one place in the *Enmons* opinion does not have the significance to which

defendants ascribe it, because the *Enmons* Court was simply providing an example when it

quoted the language of the indictment in *Green*.    Indictments are always drafted in the

conjunctive, and the use of "and" instead of "or" is not dispositive.    Moreover, the underlying

facts in *Green* conclusively demonstrate that fictitiousness is not a prerequisite for illegitimate

labor objectives.    The *Green* defendants demanded that employers of operating engineers hire

members of the local union "as 'swampers,' whose primary duty was to scout ahead of the

bulldozers and warn of approaching pitfalls."    *See United States v. Green*, 246 F.2d 155, 158

(7th Cir. 1957).    One of the employers in *Green* testified that "'we done a lot of maintenance

work for the Government and we never did have one before, and I didn't see no need for him

21

being out there.'"   *Id*.   Another employer testified that he had refused to hire a swamper and told defendant Jack Green "'I can't afford to put a laborer on each one of these tractors.'"   246 F.2d at 159.   The Seventh Circuit panel concluded that, in the face of resulting force and violence, attempted extortion had been proven because "the contractors never hired the unwanted, unneeded 'swampers.'"   *Id.*   In *Green,* the services for which wages were exacted were not "fictitious" services; they were real jobs that were offered to be performed.   The services of swampers were offered to walk in front of bulldozers, but the engineers did not need members of a local union to perform that task – thus, the uni*on services were unwanted, unnecessary and superfluous.   See United States v. McFarland*, 311 F.3d 376, 388 (5th Cir. 2002) ("In *Green,* the Court held the Hobbs Act applied to a union agent's threats of violence to force an employer to pay union me*mbers for unwanted and superfluous services…").*

Furthermore, in its decision upholding the indictment in *Green,* the Supreme Court had made clear that the Hobbs Act continued to prohibit the extortion of wages for imposed unwanted and superfluous labor, albeit labor to be performed and therefore not in violation of the Taft-Hartley Act's unfair labor practice for wage exactions at 29 U.S.C. § 158(b)(6), when it explained that its decision in *American Newspaper Publishers Ass'n*., 345 U.S. 100 (U.S. 1953), had no application to the defendant Green's wage demands for the hiring of laborers to perform unnecessary and superfluous services as "swampers" in violation of the Hobbs Act.   *United States v. Green,* 350 U.S. at 418 n. 3 (citing lower court's erroneous reliance on *American Newspaper Publishers* in *United States v. Green*, 135 F.Supp.162 (S.D. Ill. 1955)) and 350 U.S. at 420 n. 6 (noting later enactment of Taft-Hartley Act's wage exaction unfair labor practice).

Moreover, the *Enmons* Court's approval of the decision in *Kemble* should erase any

doubt that the government need only prove the labor was unwanted and superfluous.   *See Enmons,* 410 U.S. at 409 (discussing *Kemble* with approval).   The truck driver in *Kemble* "did not want or need a helper," had been paid to unload the truck himself, and had already begun the work when the defendant arrived.   The labor was not "fictitious," because the work was real. "[P]ayment of money for imposed, unwanted and superfluous services…is within the language and intendment of the [Hobbs Act]."   *Kemble,* 198 F.2d at 890; *see also Enmons,* 410 U.S. at 409 (characterizing services at issue in *Kemble* as "superfluous"); *United States v. McCullough,* 427 F. Supp. 246 (E.D. Pa 1977) (citing *Enmons* and *Kemble* and holding "when labor union members or officers attempted to impose unwanted or unneeded union services, then extortion was made out.").

The limited issue before the Court in *Enmons* was "whether the Hobbs Act proscribed violence committed during a lawful strike for the purpose of inducing an employer's agreement to legitimate collective-barganing [sic] demands."   *Id.* at 399.   That setting is quite different than the economic coercion of non-union employers to pay for labor they did not need or want. Various courts which have considered the *Enmons* case have expressed doubt about its application outside the collective bargaining context.   *See United States v. Porcaro*, 648 F.2d 753, 760 (1st Cir. 1981) (limiting *Enmons* "to the labor context and more specifically to the strike context"); *see also United States v. Jones*, 766 F.2d 994, 1002-1003 (6th Cir. 1985) (doubting whether *Enmon*s covers the use of violence to persuade employees of non-union employer to join the union, because such conduct is "outside of the collective-bargaining context and in pursuit of goals other than higher wages and against individuals other than the strikers' employer"); *A. Terzi Productions, Inc. v. Theatrical Protective Union*, 2 F.Supp.2d 485, 505

(S.D. N.Y. 1998) ("[s]ignificantly, *Enmons* did not discuss what besides striking for higher wages constitutes 'legitimate labor ends'"); *United States v. Markle,* 628 F.3d 58, 62 (2d Cir. 2010) ("Other circuit courts rarely have extended *Enmons* beyond the context of strikes or collective bargaining negotiations between unions and employers) (collecting cases).    Thus, while it seems doubtful that the holding in *Enmons* even reaches the conduct at issue in the Indictment before this Court, where Local 25 had no collective bargaining agreement with Company A, if it does so reach, the holding does not require the government to prove that the services were both fictitious and unwanted.

### 2.    The Indictment Alleges a *Mens Rea* Element of the Offense

Next, defendants argue that the Indictment should be dismissed as the government has failed to allege an essential *mens rea* element of the offense.    This argument fails as well.[4] The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on . . . indictment of a Grand Jury."    U.S. Const. amend. V. The Sixth Amendment then grants certain rights to persons charged with crimes by the federal government, including the right "to be informed of the nature and cause of the accusation." U.S. Const. amend. VI.

Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged," and "must give the official or customary citation of the statute, rule, regulation, or

---

[4]Defendants correctly argue that *United States v. Sturm,* 870 F.2d769 (1st Cir. 1989) requires the government to prove that defendants knew that their actions were in pursuit of illegitimate union objectives when they threatened economic harm to Company A.   However, defendants cite no legal authority for the proposition that this language must be alleged in the Indictment because there is no such requirement.   This language certainly does not need to be alleged in the Indictment or even proven with respect to the other extortionate means used by defendants, including actual fear of force, violence, and fear of physical harm.

other provision of law that the defendant is alleged to have violated."   Fed. R. Crim. P. 7(c).

Considering these principles, courts have held that "an indictment is sufficient if it, first contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."   *United States v. Cianci,* 378 F.3d 71, 81 (1st Cir. 2004) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).   "Although it is generally the better practice, these elements need not always be set forth *in haec verba*.   Indictments must be read to include facts which are necessarily implied by the specific allegations made."   *United States v. Barbato*, 471 F.2d 918, 921 (1st Cir. 1973) (internal quotations and citation omitted).

Indeed, the First Circuit has noted that indictments "need not always plead required scienter elements in precise statutory terms such as 'willfully' or 'knowingly' so long as other words or facts contained in the indictment necessarily or fairly import guilty knowledge." *United States v. McLennan*, 672 F.2d 239, 242 (1st Cir. 1982) (quoting *Madsen v. United States*, 165 F.2d 507, 509-510 (10th Cir. 1947)).

As the Supreme Court has said, "the Federal Rules were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure. While detailed allegations might well have been required under common-law pleading rules, they surely are not contemplated by Rule 7(c)(1)."   *United States v. Resendez-Ponce*, 549 U.S. 102, 110 (2007) (citations omitted).

In *United States v. Jackson*, 749 F.Supp.2d 19 (N.D.N.Y. 2010), the court held that the *mens rea* element of knowingly and willingly as required for a Hobbs Act conviction under Title 18, United States Code, Section 1951 can be implied by the facts in the Indictment.   Moreover,

contrary to defendants' argument, scienter does not need to be pleaded beyond the statutory

language of the Hobbs Act extortion because the necessary scienter is embodied in the word

"wrongful."   The First Circuit in *United States v. Sturm*, 870 F.2d 769, 777 (1st Cir. 1989),

explained:

> . . . we have held that in cases involving extortion based on wrongful use of economic
> fear, the intent component of the wrongfulness element requires the government to
> establish that the defendant knew that he had no legitimate claim of right to the property
> in question. This holding corresponds in the following manner to *Sturm's* specific intent
> claims. To the extent that our holding requires a mental state above and beyond the
> mental state required with respect to the actus reus of extortion, we agree that extortion
> under the Hobbs Act requires the "special mental element" version of specific intent that
> we have described above.   We do not, however, express any opinion about the intent
> required for other elements of this offense.   Nor do we express any opinion about
> whether extortion under the Hobbs Act requires the "evil motive" version of specific
> intent that we have described above.

Applying these legal principles to the Indictment in this case, it is clear the allegations

made against the defendants are sufficient and their motion to dismiss should be denied.

### 3.   The Hobbs Act, As Applied, is Not Unconstitutionally Vague

Defendants argue that the Court should dismiss the Superseding Indictment because the

Hobbs Act, as construed in *Enmons* and as applied by the government in this case, is

unconstitutionally vague.   (Motion at 19-29).   A statute is unconstitutionally vague only if it

"forbids or requires the doing of an act in terms so vague that men of common intelligence must

necessarily guess at its meaning and differ as to its application."   *United States v. Lanier,* 520

U.S. 259, 266 (1997) (citations omitted).   "The underlying principle is that no man shall be held

criminally responsible for conduct which he could not reasonably understand to be proscribed."

*United States v. Harriss*, 347 U.S. 612, 618 (1954).   However, a statute is not required to set

forth every possible scenario prohibited by its terms.   As the Supreme Court explained in

*United States v. National Dairy Corp.*, 372 U.S. 29, 32 (1963) (citations omitted):

> The strong presumptive validity that attaches to an Act of Congress
> has led this Court to hold many times that statutes are not
> automatically invalidated as vague simply because difficulty is
> found in determining whether certain marginal offenses fall within
> their language ....   Indeed, we have consistently sought an
> interpretation which supports the constitutionality of legislation.

The First Circuit has offered guidance to courts seeking such an interpretation: "A statute whose

terms have a commonly understood meaning or have been clarified by judicial explanation or by

application to particular conduct is not unconstitutionally vague."   *Robinson v. Berman*, 594

F.2d 1, 2 (1st Cir. 1979) (citing *Rose v. Locke*, 423 U.S. 48, 50-52 (1975)).

As set forth above, Congress enacted the Hobbs Act to address the holding of *Local 807*

and allow the prosecution of wage demands for fictitious no-show labor and wage demands for

additional, superfluous labor.   Congress acted similarly to address a Supreme Court holding (in

*McNally v. United States*, 483 U.S. 350 (1987)) when it enacted the honest services fraud statute,

18 U.S.C. § 1346.   Just as Congress intended to confine honest services fraud to the bribes and

kickbacks that had been prosecuted before *McNally*, Congress intended to confine wage

demands for unwanted, unnecessary and superfluous labor to the scenarios prosecuted in *Local

807*.   Because defendants' conduct falls right in the *Local 807* wheelhouse, the Hobbs Act is not

void for vagueness as applied to the facts of this case.   *See Skilling v. United States*, 561 U.S.

358, 411 (2010) (because it has always been "as plain as a pikestaff" that bribes and kickbacks

constitute honest services fraud, Section 1346 was not void for vagueness as applied to those

activities).

In addition, courts have routinely held that the Hobbs Act prohibits the conduct alleged in

the Indictment, *i.e.*, the use of threats of violence and economic harm to force an employer to

place a person on his or her payroll solely in exchange for preventing that person or other people

or organizations he is associated with from disrupting the work site.   Defendants' assertion that

because the *Supreme Court* "has not further defined the meaning of 'imposed, unwanted,

superfluous and fictitious,'" the application of the Hobbs Act in this case violates Due Process

(Motion at 20) was specifically rejected in *Lanier*.   520 U.S. at 268 (rejecting argument that

only Supreme Court precedent can provide fair warning that conduct violates statute).

Likewise, precedents need not present "fundamentally similar" factual situations in order to

provide fair warning that conduct at issue violates the statute.   *Id.*

   The lower court decisions described above gave defendants fair warning that their

conduct was prohibited by law.[5]   Despite their sanitized version of the events of June 10, 2014,

defendants are not charged with "picket[ing] a production for an hour or two," or with "picketing

[which] was overwhelmingly peaceful," or "lawful, [First-Amendment] protected picketing."

(Motion at 23, 26).[6]   They are charged with using threats of violence and economic harm,

including chest-bumping, knuckle-cracking, racial and homophobic slurs, tire slashing, blocking

---

[5] Defendants' assertion that they must have notice not only that their conduct is illegal, but that it is illegal *under the Hobbs Act*, is entirely unsupported by the cited cases (Motion at 22) and has been rejected by at least one court. *See United States v. Gannon*, 684 F.2d 433, 439-40 (7th Cir. 1981) ("[Defendant] cannot claim that he was unfairly surprised that his conduct was illegal, only that it was proscribed under this specific statute.   It is well established, however, that in light of the strong presumption of validity that attaches to Acts of Congress, the fact that individuals may differ regarding whether or not certain marginal offenses fall within a specific statute's terms does not by itself render the statute unconstitutional.") (citing *United States v. National Dairy Products Corp.*, 372 U.S. 29, 33 (1981)).   The question before the Court is not whether defendants had actual notice that the Hobbs Act prohibited their conduct, but whether the Hobbs Act provides fair notice to people of common intelligence that the conduct charged was proscribed.   *United States v. Bohai Trading Co., Inc.*, 45 F.3d 577, 581 (1st Cir. 1995).

[6] Defendants may not attack Section 1951 as unconstitutionally vague simply by showing that hypothetical situations may exist in which the text of the statute might be ambiguous.   Rather, they can prevail only by showing that the statute failed to provide clear warning that their own conduct was proscribed.   *See Chapman v. United States*, 500 U.S. 453, 467 (1991) ("First Amendment freedoms are not infringed . . . so the vagueness claim must be evaluated as the statute is applied to the facts of this case."); *United States v. Mazurie*, 419 U.S. 544, 550 (1975) ("[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."); *Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.").

the entrance to Restaurant A, and blocking delivery trucks, to extort Company A into hiring Teamsters to do work Company A did not need the Teamsters to do.    A person of ordinary intelligence and common sense surely knows that using slurs, threats and acts of violence, and blocking access to a business in order to obtain wages to which he was not entitled is illegal. The history of the Hobbs Act, Supreme Court decisions applying the statute and lower court decisions described above together provided more than fair warning that defendants' conduct was prohibited by law.    Indeed, Local 25 – under the signature of O'Brien and with HARRINGTON's name attached – published "Instructions to Picketers" which specifically instructed Teamsters who were engaged in picketing to act in accordance with the law:

- "You are to conduct yourself in a responsible, professional and peaceful manner at all times.    You are forbidden to engage in any altercation, argument, vandalism or misconduct of any kind.    Do not use boisterous or indecent language."
- "You are to picket on the sidewalk or on a public way."
- "Do not in any way obstruct any entrances or exits to any place of business or parking lot."
- "You are not to interfere with the work of any employee."
- "Pickets should keep moving and not block traffic."

Furthermore, a requirement that conduct be committed "knowingly," "willfully" or with specific criminal intent usually precludes a finding of vagueness because to prove the offense the government must prove beyond a reasonable doubt that the defendant knew that his conduct was unlawful.    *See, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 113-14 (1972); *United States v. National Dairy Corp.*, 372 U.S. 29, 35 (1963).    As the First Circuit has reasoned, "[t]he essence of the fair warning requirement of the due process clause is that a person should not be punished for an act he could not know was criminal."    *Robinson v. Berman*, 594 F.2d 1, 3 (1st Cir. 1979). There is no such risk when criminal intent is an element of proof.    "A mind intent upon willful evasion is inconsistent with surprised innocence."    *United States v. Ragen*, 314 U.S. 513, 524

(1942).

As set forth above, contrary to defendants' allegation that the Hobbs Act "lack[s] a scienter requirement relating to the defendant's knowledge" (Motion at 24), the Hobbs Act charges in the Indictment require the government to demonstrate that the defendants' conduct was "wrongful."   In fact, in order to sustain its burden of proof at trial, the government must prove that defendants "knowingly and willfully obtained property" from Company A by means of extortion that affected interstate commerce.   *See* First Circuit Pattern Jury Instructions, § 4.18.1951.   Because the government is required to prove that the defendant acted with the specific intent to commit the underlying crime, a finding of vagueness is precluded in this case.

## CONCLUSION

For the foregoing reasons, the defendants' motion should be denied.

Respectfully Submitted,

CARMEN M. ORTIZ
United States Attorney

By:      */s/ Laura J. Kaplan*
Laura J. Kaplan
Kristina E. Barclay
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Laura J. Kaplan*
Laura J. Kaplan
Assistant United States Attorney

Date:   December 16, 2015